BRADBURN VS. UNITED STATES.

Opinion delivered October 4, 1901.

1.   *Criminal   Law—Murder—Evidence—Explanatory   of   Flight   of
     Defendant.*

> In a prosecution for murder the state proved that the defendant
> left the country immediately after the killing, which was ad-
> mitted but claimed to have been done in self-defense.   *Held*,
> that it was error to exclude testimony of witnesses called by
> the defendant to show that his flight was taken upon the ad-
> vise of his friends, and to escape anticipated danger from
> friends of deceased.

2.   *Murder—Instructions.*

> Where the defendant in a trial for murder pleads self-defense
> and requests an instruction governing the law of self-defense
> and includes therein a statement concerning death resulting
> from the use of a weapon, not ordinarily deadly, and by acci-
> dent or inadvertence, it is not error for the court to omit from
> his charge to the jury the incorrect statement of the principle
> of accidental killing.

3.   *Self-defense—Instructions.*

> It is error, in a prosecution for murder, the defendant claiming
> self-defense, to instruct the jury that "two persons cannot
> engage in mortal combat and each be acting in self-defense."
> It is a question for the jury whether defendant was acting
> under the law of self-defense at time of homicide, regardless
> of whether the deceased was in the same attitude.

4.   *Murder—Improper Argument,*

> In a trial for murder there was evidence introduced, some for
> purposes of contradiction of defendant's witnesses, and some
> without objection, tending to show that the defendant had
> been arrested, charged with stealing cattle, had resisted de-
> puty marshals and was a fugitive from justice at the time of
> the homicide.   One of the counsel for the government in his

argument to the jury referred to the defendant as a cattle-thief and a dare-devil who resisted officers, and the court, upon the objection of defendant's counsel and motion to·exclude the statement from the jury, merely directed counsel to "remain in the record" but failed to admonish the jury that they should not consider such remarks and to exclude same. *Held*, that this was error, and the motion should have been granted and the jury admonished to disregard such remarks, for there was no competent evidence of such facts, and the defendant was thereby prevented from having an impartial trial.

Appeal from the United States court for the Southern district.

HOSEA TOWNSEND, Judge.

Lish Bradburn, indicted for·murder, was convicted of manslaughter and appeals.    Reversed.

This is a case upon a charge of murder.    The facts of the killing were that the defendant and the deceased, one John Evans, had a misunderstanding with regard to a small indebtedness claimed to be owing by the deceased to the defendant.  On the day of the killing (and the killing is admitted by the defendant) the two rode off together for the purpose of going to the home of a man by the name of Stair, ·whom the deceased claimed really owed the debt.    Their object in going to Stair's was probably to settle their differences.    On the way, when no one was present save themselves, the defendant killed the deceased.  He immediately informed the neighbors of the occurrence, claiming that deceased had provoked a general quarrel with him about the debt, and had obtained a rock, with which he was trying to strike defendant, when he (the defendant), in order to avoid the blow; struck him with his fist upon the neck, and unintentionally killed him.    Shortly thereafter defendant fled the country.    Upon the person of deceased, about the face and neck, there were found some two or three bruised places,

where he evidently had been stricken. About one year after the killing the defendant was arrested, and indicted and tried for murder, the trial resulting in a conviction for manslaughter, and the defendant was sentenced to imprisonment for ten years. During the trial exceptions were saved to the admissibility of certain evidence; the charge of the court, and to what was claimed to be improper language of the attorney representing the government in his closing argument to the jury. The case is regularly appealed to this court.

*Eddleman & Graham* and *Furman, Herbert & Mathers,* for appellant.

W. B. Johnson, U. S. Atty., and J. E. Humphrey, Asst. U. S. Atty.

CLAYTON, J. At the trial it was proven by the government that shortly after the killing the defendant fled the country. To explain the reasons for his flight, the defendant recalled a government witness by the name of E. J. Horn, and asked him the following question. "Q. I will ask you this question: If you did not tell Lish Bradburn [the defendant], in the presence of Tom Norman, 'You had better leave the country, on account of the friends and kinsfolk of this man; that they may hurt you?" To which the witness answered: "I couldn't answer whether I did or not. * * * I don't remember." Afterwards the said Tom Norman was put upon the stand by the defendant, who testified that shortly after the killing, on the same day, and immediately before the flight of defendant, he saw the defendant in company with Horn at his (Horn's) house. The record then shows the following questions by Mr. Merrill Johnson, one of the counsel for defendant: "Q. I will ask you if you heard a conversation between Mr. Horn and Mr. Bradburn that day with regard to this case. A. Yes, sir. Q. I will ask you if in that conversation, if Mr. Horn didn't

tell Lish Bradburn—Mr. W. B. Johnson, U. S. Attorney: That about leaving? Mr. Merrill Johnson: Yes, sir. Mr. W. B. Johnson: We object to that for two reasons. In the first place, he put him on there as his own witness after the government closed its case. In the second place, he said he didn't recollect. It is for two reasons. I object to this witness relating anything about the conversation. (Which objection was by the court sustained, to which ruling of the court the defendant, by his counsel, then and there duly excepted.) Q. Then, Mr. Norman, go ahead and tell what took place between these parties. (Objected to.) The Court: What parties are you talking about? You can't ask him now with reference to a contradiction of Horn. Mr. Eddleman: We leave that off, and ask him what took place there. Mr. Johnson asked Horn about making a particular statement. Horn answered that he didn't remember making it. Now, then, Mr. Johnson asks this witness if he heard Horn make that identical statement. Now, then, laying aside the matter of contradiction at all, this witness says he went over to Horn's house and the defendant was there. Now, we want him to tell the transactions that occurred, independent of any conversations or statements. The Court: He can tell what actually occurred, but can't tell what was said. Mr. W. B. Johnson: In the first place, the government has a right to introduce any statements made by the defendant that may tend to incriminate him; and, in the second place, the defendant cannot introduce any statement made by himself. Mr. Eddleman: We want to explain this defendant leaving there. The Court: Let him tell about that, but no conversations now. Mr. Eddleman: And how he come to leave. The Court: Yes, sir; let him proceed. You can't tell any conversations between him and Horn, but, if there was anything done, he can tell it,—what was done; what Bradburn did. You can tell that. I won't listen to any argument. Mr. Merrill Johnson: The court don't know what I am going to say. I want to make a statement to the

court. I want to except to the court ruling I shan't make a statement before I have made it. Q. Mr. Norman, do you know whether Mr. Bradburn left there or not ttha day? A. Yes; sir; he left there. Q Can you tell the jury of your own knowledge what caused him to leave? A. Yes, sir; I think I can. Q. Well, state to the jury what it was. Mr. W. B. Johnson: I object, if the court please, to any statement made to Mr. Bradburn, either by him or to him, by anybody. The Court: That objection is sustained with reference to any statement. If he can state any fact, he can state it. A self-serving declaration cannot be stated. Mr. Merrill Johnson: If somebody advised Mr. Bradburn what to do— The Court: You can't ask him if Mr. Horn did it. That has been ruled out. Mr. Eddleman: Can't we show that as an independent fact, without any contradiction at all? The Court: No, sir. Mr. Eddleman: I want to state what we propose to show by this witness, and probably it wouldn't be right to state it in the presence of the jury. The Court: Very well. I will let the jury retire. (Thereupon the jury were retired from the court room.) Mr. Eddleman: We propose to show by this witness, Tom Norman, if the court please: That he went from where this killing took place, in the road, over to Mr. Horn's place. That on the way over there he met Mr. Horn and told him that he wanted to go—that he was going—to his house to get some camphor and some whisky; that he was afraid Mr. Evans was dead, but wanted to get some camphor and whisky to see what he could do for him, That Mr. Horn went back with him to his house, where the defendant, Bradburn, was, told him that he would go and take these things back over there and do what he could for the deceased, but for Norman to go with the defendant and take him to the railroad, and for the defendant to go away. The Court: What's that? Mr. Eddleman: Told Norman and the defendant for Norman to go with the defendant to the railroad, and for the defendant to go away; that those people or somebody there

might do him harm, and he must get out of the way, at least for the time. The Court: Well, that involves the same proposition you asked Mr. Horn. The statement as to his going up there, meeting Horn, and about getting the camphor, etc., would be proper. Mr. Eddleman: I want to show that he left there upon the advice of a friend who was older than he, and who he thought was his friend. The Court: We will not let him make that statement. (To which ruling of the court the defendant, by his counsel, then and there duly excepted. Thereupon the jury were returned into court.)" During the examination the witness also stated that while at Horn's he wanted to go back to where the body of deceased was, but Horn would not let him go, because he wanted him to go away with defendant; that he wanted him' to take him (defendant) to the railroad. On motion of United States attorney, this was ruled out, over the objection and exception of defendant. To this proceeding the appellant files three specifications of error. They are: "First. The court erred in refusing to permit appellant to prove by disinterested witnesses that he left the country soon after the homicide upon the advice of E. J. Horn, and to prove what the said E. J. Horn said to appellant with reference to said matter; the government having proved that appellant fled the country soon after the homicide. Second. The court erred in refusing to allow appellant to contradict the government's witness E. J. Horn by proving that said witness immediately after the homicide advised appellant to leave the country because there was danger that the friends and relatives of deceased might inflict serious bodily injury upon appellant or kill him; the said witness Horn having testified that he did not remember giving such advice to appellant. Third. The court erred in striking out the testimony of the witness Tom Norman to the effect that soon after the homicide E. J. Horn, a witness for the government, advised appellant to go at once to the railroad and leave the country."

(40)

After the government had proven the circumstance of flight in support of its theory of defendant's guilt, the defendant, after admitting the fact, certainly had the right to offer any proof at his command which would tend to explain the act of flight upon some other theory than that it was induced by a consciousness of guilt; and for this purpose it is competent for the defendant to show that he was advised to leave the country to avoid harm from the relatives of the deceased. Underh. Ev. 119; Whart. Cr. Ev. 750; Arnold vs State, 9 Tex. App. 439; Lewallen vs State, 33 Tex. Cr. R. 414, 26 S. W. 832. And he is not required to prove this fact by any particular witness. Any person who may have heard the advice given is competent to prove it. If A. testifies that he heard B. say to C., "You had better leave the country, to save you from harm at the hands of the friends of the man you have killed," this is not hearsay testimony, because the very fact sought to be proven is that C. was told by B. to leave, and therefore he who heard it is competent to prove the fact, and his testimony is primary evidence of it. That the testimony was competent was recognized by the court, for the defendant was afterwards allowed to testify to it. The evidence of Norman seems to have been rejected, not on the ground that it was not competent, but because it was supposed to have the effect of impeaching the defendant's witness Horn, who had testified that he did not remember of having advised the defendant to flee. For the purpose of proving the fact, Horn was clearly the defendant's witness, and therefore could not be impeached by him by showing he had made contradictory statements to those made on the stand; and, if the testimony of Norman was introduced for the purpose of impeaching him, the court's ruling was right. But the question asked Horn was not as to some contradictory declaration which he had made in relation to an event after its occurrence, but it was as to words which it was claimed that he used which constituted an important and a material fact in the case, to wit,

that the defendant was advised to leave the country, and, like any other fact, could be testified to by any witness who knew it; and if it should have slipped the memory of Horn, or even had he positively denied its existence, although the defendant's witness, this would not prevent the defendant from proving it by any other witness who might know this fact. It is true it would have a tendency to impeach Horn, but the witness having been introduced for the purpose of proving a fact in the case, and not as to a declaration made about the fact, his testimony was competent and admissible. If my witness testifies to a fact against me, I may not seek to impeach him, but I may nevertheless introduce proof to show the fact to be different from that which he has stated: Mr. Wharton, in his Law of Evidence (volume 1, § 549), says. "In this country, while a party cannot ordinarily discredit his own witness, his right to prove facts inconsistent with those stated by such witness is unquestioned, even though this discredit the witness materially. And he may examine the witness in advance as to such conflicting facts, arraying them, as it were, against him, though beyond this in the way of impeaching the witness the privilege does not go." And in footnote 1 he cites many authorities sustaining the text. The court seems to have regarded the words of Horn as a declaration out of court, rather than words spoken constituting a verbal fact. We are of the opinion, therefore, that the court erred in rejecting the testimony of Norman above set out.

The fourth specification of error is as follows: "Fourth. The court erred in refusing to give the following instruction to the jury as requested by the defendant: 'If the defendant used only such means as were apparently necessary to repel the force used by the deceased and protect himself from apparently bodily harm, this he had the right to do; and if, in the exercise of such apparently necessary self-defense, death resulted from the use of a weapon not ordinarily a deadly weapon, from inadvertence or acci-

dent, then defendant would not be guilty'." This instruction was modified and given by the court as follows: "If the defendant used only such means as were apparently necessary to repel the force used by deceased and protect himself from apparent bodily harm, this he had the right to do; and if, in the exercise of such apparently necessary self-defense. death resulted, then defendant would not be guilty of murder or manslaughter, and should be acquitted." It will be observed that the only material difference between the instruction asked and the one given is that the element of accident and inadvertence is eliminated from the instruction asked for, and in this form given to the jury by the court. The definition of self-defense as asked for is retained in the given instruction. The instruction as asked is faulty in this: that after setting out the law of self-defense under a condition of facts which would justify a killing, providing the deceased was the assailant,—as if that were not sufficient,—the jury are to be virtually told that to justify an acquittal something more must appear, to wit, that the killing was done with a weapon not ordinarily a deadly one, and from inadvertence or accident. In other words, an acquittal on the ground of an accidental killing is made to depend upon self-defense. If the defendant, in the language of the instruction, "used only such means as were apparently necessary to repel the force used by deceased and protect himself from apparent bodily harm." what difference would there be if the weapon were deadly or otherwise? And what has the question as to whether the killing was accidental or not to do with it? If the attack of deceased were unlawful, and the defendant used only such means as were necessary to repel the assault, his defense was perfect; but the instruction requested would, inferentially, at least, inform the jury that it was not. The requested charge, although probably intended, does not state the law of an unintentional killing done in the doing of a lawful act. It is lawful to repel an unlawful attack, although not a deadly

one, and in such case, if the killing be not intentional, nor excessive force used, and the defendant is doing a lawful act, it is excusable; and under the testimony of the defendant in this case, had such an instruction been asked, the court would probably have given it. But the instruction under consideration which was asked certainly does not state correctly this principle of the criminal law. In the first place, there is no distinction made by it as to whether the force used by the deceased was lawful or unlawful. It applies as well to a case where the defendant was the assailant as where the deceased was the assailant, and the fault is carried into the modified instruction which was given; but that only goes to the law of self-defense, which had already been fully and properly given by the court, and, as it is more favorable to the defendant than if correctly stated, he cannot complain. Again, the words, "death resulted from the use of a weapon not ordinarily a deadly weapon, from inadvertence or accident," do not sufficiently inform the jury that death must have been unintentional and without the use of excessive force, and while the defendant was doing a lawful act. We find no reversible error because of the fact that the court refused to give the instruction as asked, and in giving it as modified.

The fifth specification of error is as follows: "The court erred in instructing the jury as follows: 'You are instructed that two persons cannot engage in a mortal combat, and each be acting in self-defense. You are further instructed that deceased had the same right to act upon the appearance of danger as had the defendant'." In point of fact, as well as matter of law, it is not correct to say that two persons cannot engage in mortal combat, and each be acting in self-defense. Many cases could be imagined, and doubtless have occurred, where two persons might, reasonably judging from appearances of danger as presented to them, fight to the death for their lives, and both be acting within the law of self-defense. The case put by counsel for

appellant in their brief is in point: Two brothers at night each mistook the other for a burglar, and engaged in mortal combat. Each acted upon reasonable appearance of danger. Indeed, the danger was real; for each, thinking the other a burglar, intended to kill. One was killed, and if he who killed in good faith believed the other to be a burglar, and had reasonable ground to so believe, he clearly acted under the law of self-defense, but no more so then he who was slain; and either, if he should slay the other, under the circumstances, might invoke the law of self-defense. Of course, occurrences of this kind are rare, but that they do or even may occur is sufficient to destroy the proposition as a principle of law to be given by the court. It is a question for the jury to determine whether the defendant was acting under the law of self-defense at the time of the homicide, whether the deceased was or not. It is as true that where two men are engaged in mortal combat neither may be guilty, as it is that either might be guilty, if one should kill the other. It depends entirely on the circumstances proven to the jury. Under the facts of this case, however, we fail to see that the defendant was prejudiced by the giving of the instruction, and, were it not for other errors appearing in the record, we would be loath to reverse the case solely on this ground.

The sixth and last specification of error is: "The court erred in not sustaining appellant's objections to, and in not withdrawing from the jury, the following remarks made by counsel for the government in his closing argument to the jury: 'Gentlemen of the jury, that rooster (pointing to defendant) has been stealing cattle and fighting deputy marshals until he has become a desperate dare-devil, and he did not care what he did'." The record shows the following in relation to this matter: "During the closing argument for the government, Mr. Reynolds told the jury, in substance, as follows: 'Gentlemen of the jury, that rooster (pointing to the defendant) has been stealing cattle and fighting the deputy marshals until he has become a desperate dare-devil,

and he did not care what he did.' Counsel for defendant then and there objected to the argument made by counsel for the government, and moved the court to exclude the same from the jury. That the court stated to counsel for government to remain in the record, but did not admonish the jury that such statement of supposed facts by counsel should not be considered by them, and the same was not withdrawn from the jury, to which action of the court the defendant then and there, in open court, duly excepted, and still excepts." There was evidence introduced by the government to the effect that the defendant had been charged with cattle-stealing, and tried and acquitted, in Texas; that the deceased had reported that he had seen the defendant with two head of cattle which "suited the description of the stolen ones." This was admitted in evidence as tending to show bad blood and a motive for the killing. On cross-examination of defendant the following questions were asked by the United States attorney, and answers made, to wit: "Q. How many times do you say you have been arrested? A. Three or four times. Q. What for? A. I was arrested on two complaints for assault to kill. Q. What else? A. And two for larceny. Q. Anything else? A. No, sir Q. Ever arrested for peddling whisky out here at Healdon? A. No, sir. Q. When was it you got your ear shot off out there? A. That was the time they claimed I committed an assault on a deputy marshal. Q. That was the time you were resisting an arrest by the officer? A. Yes, sir. Q. And your ear was shot off by the officer? A- Yes, sir. Q. Where did that occur? A. Out near Burlington. Q. Done by George Tucker? A. Henry Denny, a deputy under George Tucker. Q. Tucker was along? A. Yes, sir. Q. Was he trying to arrest you, for what, then? A. Introducing liquor. Q. Then you were arrested twice for assault to kill? A. This introducing liquor and assault to kill was all one. Q. But they were trying to arrest you for introducing liquor at that time, and you resisted the officers, and then it

was changed to assault to kill? A. Yes, sir. Q. Then you were arrested again for assault to kill. Who was that on? A. A fellow by the name of Castleman. Q. Where did that occur? A. At Healdon. Q. Where were you arrested the next time for stealing cattle?. A. There was a complaint sworn out against me by Mr. Beemer, the prosecuting witness in this case, for stealing a steer down here. Q. Isn't it a fact it got so warm for you at Healdon you moved into that country? A. No, sir. Q. Isn't it a fact it has got so warm for you in that country you and your family picked up your lease and moved to Oklahoma? A. We had moved there before we got into this last trouble. Q. I am talking about before that. A. No, sir. Q. Isn't it a fact this old preacher had met you down in the bottom with two head of stolen cattle, and gone and reported this matter on you? A. I never met him in my life, as I remember. Q. Didn't you request him not to say anything about seeing you? A. No, sir; never knew anything about it. Q. You knew where Mr. Beemer lived. That was the time when you were arrested, wasn't it? A. No, sir; this was in the spring of 1896, Mr. Beemer had me arrested. Q. This other was in 1897,—I am talking about February, 1897. A. Don't know anything about that at all. At that time I was living in Oklahoma,— the time you speak of. Q. The spring of 1897? A. Yes, sir; I left there in October, 1896. Q. Wasn't it a fact you were a fugitive from justice at the time you killed this man? A. I was not. Q. And wasn't it a fact that there was fifty dollars reward out then for you for stealing cattle? A. Never was a reward for me. Q. Isn't it a fact that Mr. Everhart was over there looking for you just before you cut this wheat? A. I couldn't say that he was, for I never heard of him." The testimony of defendant relating to having his ear shot off was afterwards excluded by the court. With the exception of that part of the cross-examination as above set out which relates to the claim that the defendant met "the old preacher," who was the deceased, and had at

that time two stolen head of cattle, and asked the deceased to say nothing about it, all of which was denied by the defendant and not otherwise proven, the proof was admitted solely for the purpose of discrediting the witness, and could be used for no other purpose.    Many of the questions were highly improper and should not have been asked, and, no doubt, would not have been permitted if objection had been made.    We point out a few of them, not for the purpose of criticising the court, for the questions were not objected to, for the purpose of emphasizing the language of government counsel when they came to comment on this part of the case before the jury:   "Q. When was it you got your ear shot off?"   It is true that this question and the answer to it were afterward excluded,  but the following ones were not:   "Q. That was the time you were resisting arrest by the officer?" "Q. Isn't it a fact it has got so warm for you at Healdon you moved into that country?"   "Q. Isn't it a fact it has got so warm for you in that country you and your family picked up your lease and moved to Oklahoma?"    "Q. Wasn't it a fact you were a fugitive from justice at the time you killed this man?"   "Q. And wasn't it a fact there was fifty dollars reward out then for you for stealing cattle?" "Q. Isn't it a fact Mr. Everhart was over there looking for you just before you cut this wheat?"   The facts that the defendant resisted arrest prior to the killing, and that it got so warm for him that he was required to leave, and picked up his lease, and he and his family moved to Oklahoma, and that he was a fugitive from justice at the time of the killing, and that $50 reward had been offered for him for stealing cattle, and that Everhart was looking for him,—of course, presumably for the purpose of arresting him for some crime he had committed before the homicide,—if true, tended to prove no fact in this case, and were not admissible for the purpose of discrediting the defendant as a witness.    If he were being tried for the alleged crimes which he was supposed to have committed prior to the killing, they would

have been competent as tending to prove guilt in those
cases, and this is one of the very strongest reasons why this
testimony was inadmissible in this, because it was an effort
to prove guilt of other .independent crimes for the purpose
of establishing guilt in the one on trial    Had the cross-ex-
amination been limited to an attempt to. prove guilt in the
one case in which he was charged with stealing the two
head of cattle claimed to have been identified, and .reported
by the deceased as cattle "suitable" to the description of the
ones that were stolen, it possibly might have been com-
petent, as tending to show more strongly a motive for the
killing; but it was not so confined.   The proof that he was
resisting officers was only evidence of the fact that he was
guilty of the substantive crime of resisting process, and in-
ferentially that he was also guilty of the crime of introduc-
ing intoxicating liquors into the Indian Territory, for that
was the charge upon which the officer was attempting his
arrest.    And the proof, if made, that he was a fugitive from
justice at the time of the killing, and that he left the country
because it was "too warm for him," and that there was
"fifty dollars reward" offered for him, and that "Everhart
had been looking for him," all tended to show the guilt of
the other charges to the same extent that they did the steal-
ing of the two head of cattle.   Indeed, there was no dis-
crimination made between the one and the other, and the
jury could as well apply them to the two cases of assault,
the introduction of intoxicating liquor, and the other case of
larceny, as to the one in which he was charged with steal-
ing two head of cattle.   And this, to a certain extent, at
least, is what counsel for the government, in that part of
the argument complained of, asked the jury to do.   "That
rooster [the defendant] has been fighting deputy marshals
and stealing cattle until he has become a desperate dare-
devil, and he did not care what he did," is the language of
government counsel.   The proof that defendant had been
fighting deputy marshals in resisting arrest upon another

charge was not competent for any purpose in this case,— not even for the purpose of discrediting defendant as a witness: and the charge that he had stolen cattle, if competent, was not competent for the purpose for which it was used. Besides, it had not been proven. He had been arrested for the offense, it is true, but he had been tried and acquitted. And no other evidence was offered of his guilt. It is true that an effort was made by counsel for government to force defendant to admit it, but he denied it all. And, no other witness having been introduced to prove it, the government was bound by his answer as to his guilt. As to the charge made in the argument that he was a cattle thief, he offered in proof an acquittal against the government's naked charge. But the principal vice in the argument, conceding that the testimony was competent and admissible, is that it was only so for certain purposes, and among them was not to show that, being a thief and a fighter of deputy marshals, he was therefore a desperate dare-devil, who did not care what he did, and inferentially he was guilty of murder, or for that reason he was a man who would be more apt to do the deed. The government counsel under no phase of the case was warranted in using the proof for that purpose (Waldron vs Waldron, 156 U. S. 361, 15 Sup. Ct. 383, 39 L. Ed. 453), and more especially in so objectionable and intem⁻perate a manner. The defendant was being tried for murder. Government counsel were asking for a verdict which would result in taking his life. The proceedings were most serious. For government counsel, under those circumstances, to point "the finger of scorn" at the wretched man, denounce him as a "rooster" and a cattle thief, a fighter of deputy marshals, and a dare-devil who did not care what he did, upon the motion of the defendant to exclude it from the jury, deserved something more from the court, we think, than a mere admonition to "keep within the record." "A prosecuting attorney is a public officer 'acting in a quasi judicial capacity.' It is his duty to use all fair, honorable,

reasonable and lawful means.to secure the conviction of the guilty who are or may be indicted in the courts of his judicial circuit.　He should see that they have a fair and impartial trial, and avoid convictions contrary to law.　Nothing should tempt him to appeal to prejudices, to pervert the testimony, or make statements to the jury which, whether true or not, have not been proved.　The desire for success should never induce him to endeavor to obtain a verdict by arguments based on anything except the evidence in the case and the conclusions legitimately deducible from the law applicable to the same.　To convict and punish a person through the influence of prejudice and caprice is as pernicious in its consequences as the escape of a guilty man.　The forms of law should never be prostituted to such a purpose." Holder vs State 58 Ark. 481, 25 S. W. 279.　And in the case of Railroad Co. vs Sokal 61 Ark. 137, 32 S. W. 497, the court say: "While it is the duty of trial courts to confine counsel within the limits of legitimate debate, an omission to do this duty, while it may be a good reason for criticism, will not always entitle the appellant to a reversal of the court below. A failure in this respect which is not calculated to prejudice the cause of the appellant in the minds of honest men of fair intelligence is not a ground for reversal.　But material statements made by counsel of appellee outside the evidence which were likely to injure appellant, and were excepted to by him at the time, and were not cured by the court, do constitute a good cause for reversal.　Ordinarily an objection by the opposing counsel, promptly interposed, followed by a rebuke from the bench, and an admonition from the presiding judge to the jury to disregard prejudicial statements, is sufficient to cure the prejudice, but instances sometimes occur in which it is not sufficient." Railway Co. vs Cavenesse, 48 Ark. 131, 2 S. W. 505; Brown vs Swineford, 44 Wis 282, 28 Am. Rep. 582; Holder vs State, supra; Ferguson vs State, 49 Ind. 34; Shular vs State, 105 Ind. 304 4 N. E. 870, 55 Am. Rep. 211; Waldron vs Waldron, 156 U.

S 361, 15 Sup. Ct. 383, 39 L. Ed. 453; Combs vs State, 75 Ind. 220. Notwithstanding the fact that this is a criminal case, there was neither "rebuke from the bench, nor an admonition from the judge to disregard the prejudicial statement." We think this error. Let the judgment of the court below be reversed, and the cause remanded.

GILL and RAYMOND, JJ., concur.